STIRNERMAUN and HIMELY *against* COWING and others.

When goods were consigned by a person abroad to a firm or co-partnership here, which, at the time, was dissolved, but the fact unknown to the consignor, who directed them to be sent to *C.*, and one of the partners received the bill of lading, took possession of the goods, and transferred them to *H.*, under colour of a sale, in payment of his own debt: *Held*, that, the firm being dissolved at the time the bill of lading was signed, and the goods shipped, they never came into the possession of the consignees named; and that the individual partner received them, not as a member or authorized agent or representative of the firm, but as agent or trustee for the consignor; and, having no right to pledge or sell them for the security or satisfaction of his own debt, the transfer to *H.* was fraudulent and void.

THE bill stated, that the plaintiffs, though not general partners in trade, had made several shipments of goods, on joint account, to *Charleston*, (*S. C.*) consigned to *Henry Cowing & Co.* for sale, and returns in cotton. The plaintiff, *S.*, is a merchant of *Paris*, and the plaintiff, *H.*, formerly of that city, but now residing in *New-York*. The goods were generally purchased in the name of *S.*, but the correspondence and accounts with the defendants were usually in the name of the plaintiff, *H.* In *December*, 1818, the plaintiffs gave orders to their correspondents, *P. & D.*, of *Hamburgh*, to ship from that place to *Charleston*, two cases of merchandize, belonging to the plaintiffs, and to consign them to *Henry Cowing & Co.*, of *Charleston*; and that, if *P. & D.* could not find a convenient opportunity to send them direct to *Charleston*, to send them there by the way of *New-York*. The plaintiffs, with their order, sent the following letter of instructions for *Henry Cowing & Co.*, to be transmitted to them by *P. & D.*: "*Paris, December* 7th, 1818. Messrs. *Henry Cowing & Co., New-York*: The uncertainty of a direct opportunity to *Charleston*, offering at *Ham-*

*burgh,* I have ordered my correspondents, *P. & D.,* to ship the two cases of which you have invoices annexed, on board the first vessel bound to *New-York.* Should they arrive to you, you will enter them at your Custom House, and reship them immediately to Messrs. *Henry Cowing & Co.,* of *Charleston.* Be particular in sending the original invoice, and providing insurance." About the same time, the plaintiffs sent to *P. & D.* a letter for *Henry Cowing & Co.,* of *Charleston,* advising them of the shipment, and requesting them to procure speedy sales. To each of which letters was annexed an invoice of the merchandise, in French, dated at *Paris, December* 9, 1818, signed by the plaintiff, *S.* stating that the two bales of goods were sent to *Hamburgh,* to be sent to the *United States,* to the address of *Henry Cowing & Co.,* on account and at the risk of the plaintiff, *S.* The letter of instructions was enclosed in another on the subject, from *P. & D.* to *Henry Cowing & Co.* of *New-York,* dated *Hamburgh,* 6th of *February,* 1819, stating " the bill of lading of the goods shipped to their address, by order of the plaintiff, *H.;* and also three letters of *H.,* containing his directions about that shipment, which they would please to follow." *P. & D.* did, accordingly, in *February,* 1819, as agents of the plaintiffs, and on their account, ship the two cases of goods in a vessel bound to *New-York,* and in the bill of lading directed the same to be delivered at *New-York,* to *Henry Cowing & Co.* The bill stated, that the goods, with the letters of advice and instructions, arrived at *New-York,* the 21st of *April,* 1819, and were landed ; and, in consequence of the inability of *Henry Cowing* to pay the duties, were placed in the public warehouse. That *Henry C.,* at the same time, received the letters, and was made acquainted with the contents. That the supposed firm of *Henry Cowing & Co.,* at *New-York,* never existed, but *H. C.* carried on business in *New-York,* on his own individual account, and in his own name ; and that the firm

of *Henry Cowing & Co.*, at *Charleston*, consisted of *H. C.*, Seth L. Cowing*, and *Effingham Wagner*. That before the arrival of the goods in *New-York*, the firm of *Henry Cowing & Co.*, of *Charleston*, was dissolved ; and the firm and each partner had, before the sale of the goods by *H. C.* to the defendants, *Lewis C. Hammersley* and *Thomas Hammersley*, become utterly insolvent, as appeared from a letter from *S. L. C.* and *E. W.* to the plaintiff, *H.*, dated *Charleston, May* 27, 1819, stating, that if the goods should arrive, they would forward them agreeably to his orders ; and that they had stopped payment that day ; and that they would place the goods of the plaintiff, *H.*, which they had, in the hands of an agent, to his order, subject to the balance due to them.

. That the goods, now in question, were in the public warehouse, at *New-York*, on the 7th of *June*, 1819, when the defendants, *L. C.* and *T. Hammersley*, knowing that the firm of *Henry Cowing & Co.* were insolvent, and had stopped payment, and that the goods belonged wholly to the plaintiffs, and that *Henry Cowing & Co.*, of *New-York*, had been directed to send them to *Charleston*, and that *Henry C.* had no authority to sell in *New-York* ; but fraudulently contriving to obtain payment of a debt due to them from *Henry Cowing*, procured *H. C.*, under colour of a sale, to transfer the goods to them, in part payment of their debt ; and gave *H. C.* a receipt, dated *June* 4, 1819, for 1406 dollars, on account, from *Henry Cowing & Co.*, by the hands of *Henry C.* That before such sale, the letter of instructions, the letter from the plaintiffs to *Henry Cowing & Co.*, of *New-York*, the invoice, and the letter of advice from *P. & D.* to *H. C. & Co.* were shown to the defendants, *H. & H.*, who were informed of the contents thereof. That *H. C.*, by letter, dated *September* 15, 1819, at *New-York*, stated to the plaintiff, *H.*, that he had sold the goods to the defendants, *H.* and *H.*, being on account of 2500 dollars, received of them to be invested in cotton for *Hen-*

*ry Cowing & Co.*, of *Charleston*, and for which he gave credit to them. That he handed over the invoice and bills of lading, with the letters of advice from *Hamburgh* and *Paris*, with the goods, to *H. & H.* That at the time *Henry Cowing & Co.*, of *Charleston*, stopped payment, they held goods of the plaintiffs, consigned to them to sell on commission, to the amount of 15,000 dollars, on which they claimed to have a lien for 4535 dollars and 80 cents for duties and charges, and which was payed to them by the agent of the plaintiffs, before the sale by *H. C.* to the defendants, *H. & H.* That the plaintiffs were not, at the time of the sale, indebted to *H. C. & Co.* or to *H. C.*, except so far as *H. C.* might have a lien on the goods for freight; but the plaintiff had applied to the defendants, and demanded the goods, which they refused to deliver. That at the time of the sale, *H. C.* had no interest in the goods, other than a lien for freight, and was the mere agent of the plaintiffs to transmit the goods to *Charleston*. That the defendants, *H. & H.*, well knew the facts above stated, and that *H. C.* had no authority to sell the goods, or to apply them to the payment of his own debt. Prayer for general relief.

The defendants, *H. & H.*, in their answers, admitted the shipment of the goods from *Hamburgh* for the account and risk of the plaintiffs, and the bill of lading, &c., as stated in the bill. They admitted the firm of *Henry C. & Co.*, of *Charleston*, that the business of the firm was conducted at *New-York* by *H. C.*, and by the other two partners at *C.* That the partnership was dissolved before the sale of the goods to *H. & H.* But they alleged that *H. C.* was duly authorized to close the concerns of the firm at *New-York*, by collecting the debts and disposing of the property in *New-York*, and the other two partners had the same authority at *C.* They admitted that *H. C.* carried on business in *New-York*, in his own name, and on his own individual account; and that *H. C.* had stopped payment when they purchased the

goods in question, of him; and they understood that the firm at *Charleston* had stopped payment, and were insolvent; though *H. C.* represented to the defendants, *H. & H.*, that the firm was solvent. That at the time of the purchase, *H. C.* exhibited to them the bill of lading of the goods, by which they were to be delivered to *H. C. & Co.* at *New-York*, or to their assigns, they paying freight, &c., and also, the *invoice*, as charged in the bill. They denied, that they knew at the time of the purchase, that the goods belonged wholly and exclusively to the plaintiffs, or that *H. C. & Co.* of *New-York*, had been directed to send the goods to *Charleston*, or that *H. C.* had no authority to sell them. They alleged the purchase to be absolute, *bona fide*, and for a fair price; that a day or two after the purchase, and not before, *H. C.* handed to them the letter of instructions of the plaintiff, mentioned in the bill, and also, the letter from *P. & D.* of *Hamburgh*, of the 6th of *February*, 1819, which *H. C.* said were all the letters he had received, until which time the defendants, *H. & H.*, had not been informed of the existence of such letters. They admitted that the plaintiffs never had any dealings with *H. C.* individually, or with *H. C. & Co.*, of *New-York*, except in relation to those goods. They denied any tender of the freight or demand of the goods; and submitted, whether, at the time of the purchase, *H. C.*, as one of the firm of *H. C. & Co.*, had not such an interest in, and control over the goods, as authorized him to make the sale. They admitted that the plaintiffs had made previous consignments to *H. C. & Co.* at *Charleston*. They averred that, at the time of the purchase, they did not know nor suspect that the goods belonged to the plaintiffs, as *H. C.* had informed them the goods were paid for by the firm, by shipments of cotton, &c., from *Charleston*. They admitted that they made the purchase to obtain payment of a debt, and for no other purpose; and that they were, at the time, suspicious of the pecuniary circumstances of *H. C.*, as he had, then, stopped payment.

1823.

STIRNER-
MAUN
v.
COWING.

The answer of *H. C.* was a repetition of that of *H. & H.*, *mutatis mutandis.*

A replication was filed, but no proofs were taken in the cause.

*May* 31st. The cause came on to be heard on the pleadings.

*Jay* and *Roosevelt,* for the plaintiffs, contended, 1. That as the firm of *H. Cowing & Co.*, to whom the goods were consigned, was dissolved when the bill of lading was signed, the property remained in the consignors. (*Tooke* v. *Hollingsworth,* 5 *Term Rep.* 215. S. C. *affirmed in error,* 2 *Hen. Bl.* 501.)

2. That, supposing the property to have passed to the members of the dissolved firm, it passed to them as joint-tenants, not as copartners, and could not, therefore, be transferred by one of them, without the co-operation of the others, (*Sandford* v. *Mickle,* 4 *Johns. Rep.* 224. 3 *Esp. N. P. Rep.* 108.) even in payment of a joint debt. (*Smith* v. *Oriel,* 1 *East,* 368. 10 *East,* 418. 4 *Burr.* 2174.) This being the rule as regarded joint property, must, *a fortiori,* be the law in regard to *trust* property. (4 *Johns. Rep.* 224. 6 *Johns. Rep.* 39. 2 *Fonbl.* 181.)

3. That, as *H. C.* had no right to sell contrary to the orders of the consignors, his transfer passed no title to *L. C. & T. Hammersley.* (*Wheelwright* v. *Depeyster,* 1 *Johns. Rep.* 479. *Pickering* v. *Burk,* 15 *East,* 38. *Martin* v. *Coles,* 1 *M. & Selwyn,* 146. 5 *Ves.* 213. 2 *Camp. N. P.* 335. 2 *Johns. Rep.* 48. 5 *Johns. Rep.* 58. 11 *Johns. Rep.* 285. 2 *Mass. Rep.* 398. 4 *Taunton,* 24. 1 *Hen. Bl.* 357.) Had the transfer to *H. & H.*, therefore, been a sale in the *ordinary course of business,* it would have been void.

4. But *trust* property can never be applied in payment

of the debts of the trustee. (1 *Term Rep*. 370. 619. 3 *Term Rep*. 316. 3 *Bos. & Pull*. 40. 3 *Cranch's Rep*. 193. 9 *East*, 12. 1 *M. & S*. 484. 2 *Gallis*. 14. 2 *Johns. Cases*, 327.)

5. A mere credit in account is no payment as against the person equitably entitled to the proceeds, unless some new advances have been made upon the strength of such credit. (*Buller* v. *Harrison, Cowp. Rep* 565. 7 *Johns. Rep*. 179. 7 *Mass. Rep*. 319. 4 *Taunt*. 24.)

6. As the goods never came into the actual possession of *H. C. & Co*., they could have no *lien* upon them for a general balance of account; (3 *Term Rep*. 119. 783. 8 *Cranch*, 418. 420.) and if such a lien existed, it conferred no authority to sell; but, in fact, there was no balance due at the time of the sale.

7. The sale was collusive and fraudulent, and therefore void. (2 *Caines' Cases in Error*, 341. 16 *Johns. Rep*. 34. 2 *Campb. Rep*. 22. 4 *Burr* 2046. 2 *Barnw. & Ald*. 142. 3 *Johns. Rep*. 235. 1 *Gallis. Rep*. 360.) A factor has no power to pledge the goods of his principal, or to bind or affect the property, in any way, either by disposing of it by way of security, or in satisfaction of his own debt. (1 *Comyn on Contracts*, 237.)

*T. A. Emmet* and *G. Brinckerhoff*, for the defendants, discussed the facts in the cause, and contended, that *H. C.* had a right to make the sale, and that it was fair and *bona fide;* or, at any rate, the case ought to be sent to law, to determine whether there had been any fraud or collusion between the defendants to injure the plaintiffs. A solvent partner, after bankruptcy, may sell to pay a partnership debt. (*Cowp* 445. *Selw. N. P*. 1060. 4th edit.) The essence of the contract between the plaintiffs and *H. C. & Co*., was to sell and pay; and *H. C.* had a right to sell, to extinguish the balance due the firm. The destination to *C.* was an immaterial circumstance. The pos-

STIRNER-
MAUN
v.
COWING.

session of the invoice and bill of lading, was a constructive possession of the goods, and the usual commercial documents were exhibited by *H. C.* to the purchasers. If an agent conceals papers, his principal is answerable to the purchaser. (1 *Sch. and Lef.* 222.) It was a *bona fide* purchase for a valuable consideration. There is nothing like a pledge.

*July 8th.*     THE CHANCELLOR. The goods in question were intended for the house of *Henry Cowing & Co.*, of *Charleston.* The letters of the 7th of *December* and 6th of *February*, stated in the bill, and admitted in the answers, sufficiently establish this fact. They were consigned to *Henry Cowing & Co.*, of *New-York*, subject to the directions contained in those letters. The defendants, *H. & H.*, deny that they had any information or knowledge of these letters, or that *H. C.* was bound to send the goods from *New York* to *Charleston*, at the time they made the purchase, on which they rely for protection. But they knew of the invoice and bill of lading; for both were shown to them at the purchase. From those documents it appears that the goods were sent to *Henry Cowing & Co.*, on account and at the risk of the plaintiffs, or one of them. *H. & H.* saw the date of the bill of lading, and they knew that the house of *Henry Cowing & Co.* was dissolved before the bill of lading was signed, and before the goods were shipped from *Europe.*

When those defendants purchased the goods of *H. C.*, they were sufficiently informed, from those facts, that the goods were not his property, and that he had no right to sell them. The firm of *Henry Cowing & Co.*, to whom the goods had been consigned, had ceased to exist before delivery, and before the plaintiffs had parted with the possession of them, and, consequently, no title or possession had ever vested in the firm. The sending the goods for the purpose intended, was, in point of

law, a nugatory act; and *Henry C.*, when he received the goods, took them in the capacity of a mere naked agent or trustee for the plaintiffs. He was not known to the plaintiffs in his individual capacity, and in that character he had no interest in the goods. Admitting he was authorized to close the concerns of the firm at *New-York*, by collecting the debts, and disposing of the property of the firm in *New-York*, what advantage does that admission give to the defendants, when it appears that the goods never came to the possession of the firm, and that no interest or property in the goods ever passed to the firm?

The defendants, *H. & H.*, had then sufficient information touching the title of the goods, and the character under which *H. C.* assumed the control of the property, to deprive them of the character of *bona fide* purchasers, without notice of the equity of the plaintiffs. But the facts in the case go still further to exempt them from the privileges which might, in law or equity, belong to such a purchaser. They admit they took the goods in part payment of a debt due from the firm of *Henry Cowing & Co.*, and for no other purpose; that they understood at the time that the two partners in *Charleston* had stopped payment, and were insolvent; and, they say, that they were suspicious of the pecuniary circumstances of *Henry C.*, as he had stopped payment. This was, therefore, a desperate effort on the part of these defendants to secure an antecedent debt from a trustee, out of property which he held in trust; it was not the case of a debt created, or credit given, or property advanced, upon the strength of those goods. It was the appropriation of the property of the plaintiffs in the hands of *H. C.*, to pay the debts of the dissolved firm of *H. C. & Co.* The equity of the case is entirely with the plaintiffs; and the harsh features of the defence are not even softened by any well-founded pretension of a fair dealing in the market, in the ordinary course of commercial business. If the defendants can hold the property

in the way and for the cause for which they acquired it, it must be upon some very strict technical rule, at war with the principles of equity.

It is asserted in the answer, that the plaintiffs were indebted, at the time of the purchase, to the house of *Henry. Cowing & Co.*, on other commercial dealings, far beyond the amount of the goods. But the fact is admitted, that, by a receipt, dated prior to the sale, *E. W.*, one of the firm, had acknowledged payment and satisfaction of the entire demand of the house of *H. C. & Co* against the plaintiffs. The defendants aver, that this receipt was antedated by some fraudulent collusion between *E. W.* and the plaintiffs; but no proof is offered in support of that suggestion, and the receipt at the foot of the account current between the plaintiffs and *H. C. & Co.*, of *Charleston*, is to be received *prima facie*, and, on this argument, as evidence of truth. And if there was a balance due on general account from the plantiffs to the firm of *H. C. & Co.*, at the time of its dissolution, the firm had no lien on those goods, for they never came to the possession of the firm; and all the lien that *H. C.* could pretend to, by reason of his possession, was for the freight. He held them as agent or trustee for the plaintiffs, and not as authorized agent or representative of the house of *H. C. & Co.* I cannot discover any principle in the *English* law that would authorize me to hold, that a commercial house not in existence when goods were shipped, can be deemed to have received them, though they afterwards came to the hands of one of the late partners. In *Tooke* v. *Hollingworth*, (5 *Term Rep.* 215.) the language of the Court rather seemed to be, that goods sent to a person who at the time was dead, or disabled by bankruptcy from dealing, and under an incapacity to acquire property, could be recovered back, upon the principle that there was no contract. " If the purchaser be dead at the time when the goods arrive, must they go to the executor?" This

question is significantly put by Lord *Kenyon;* and another of the judges observed, that the sending of goods to a person who had become a bankrupt when the goods were sent, must be considered a nugatory act, and that the bankrupt was a non-entity as to all contracts. Cases of this kind might be put, as Lord *Kenyon* observed, which would considerably distress the argument in favour of the validity of the delivery. The principle of the civil law, and which has been adopted by writers following that system, that, for the sake of public convenience, powers do not expire until notice of the death of the principal, (*Inst.* 3. 27. 10. *2 Emerig.* 120. *Pothier,* Traitè des *Oblig.* s. 81. 148.) does not seem to have been hitherto ingrafted into the *English* law. But it is not necessary to form or declare any decided opinion on this subject; for the house, in the present case, was dissolved, and no longer in existence for the purpose of making new contracts, *before* the goods had passed out of the hands of the correspondents of the owners, and before there was even an inception of the contract, by the signing of the bill of lading. The delivery to *H. C.* could only be supported as a delivery to the house of *Henry Cowing & Co.,* upon the doctrine of relation back to a time when the house existed; and there is no ground for such a relation beyond the date of the bill of lading or consignment, and the house was then dissolved.

I conclude, therefore, that the title to the goods did not pass by the pretended sale from *Henry Cowing* to the defendants, *H. & H.;* and that they are accountable for the value of the goods, with interest, and with an allowance for the freight and charges; and I shall direct a reference to compute the amount due.

1823.

STIRNER-
MAUN
v.
COWING.

*It seems,* that the rule of the civil law, that powers do not expire until the death of the principal, has not been adopted into the English law.

Decree accordingly.